[Cite as *In re M.F.*, 2013-Ohio-1755.]

COURT OF APPEALS
ASHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| IN THE MATTER OF M.F. <br>   AN ALLEGED DEPENDENT / <br> NEGLECTED CHILD | JUDGES: <br> Hon. William B. Hoffman, P.J. <br> Hon. John W. Wise, J. <br> Hon. Craig R. Baldwin, J. <br><br> Case No. 12-COA-036 <br><br> O P I N I O N |

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Ashland County Court of Common Pleas, Juvenile Division, Case No. 20113011 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | April 11, 2013 |

APPEARANCES:

| For Appellant: | For Appellee: |
|---|---|
| JOSEPH P. KEARNS, JR. <br> Mason, Mason & Kearns <br> P.O. Box 345 <br> 153 West Main Street <br> Ashland, Ohio 44805 | FRED M. OXLEY <br> Oxley & Associates <br> 1636 Eagle Way <br> Ashland, Ohio 44805 |

*Baldwin, J.*

{¶1} Appellant P.A. appeals from the September 5, 2012 Opinion and Judgment Entry of the Ashland County Court of Common Pleas, Juvenile Division, finding her unsuitable as a parent and granting legal custody of M.F. to appellee Michael McPherran, Jr.

## STATEMENT OF THE FACTS AND CASE

{¶2} M.F.(DOB 2/2/11) is the child of appellant P.A. Both appellant and the child's father were minors at the time of M.F.'s birth. Appellee Michael McPherran, Jr. is the maternal uncle of appellant.

{¶3} On April 13, 2011, appellee filed a complaint pursuant to R.C. 2151.27 alleging that M.F. was a dependent and/or neglected child and seeking temporary custody of her. At the time the complaint was filed, appellant was 15 years old. On the same date, appellee filed a motion for ex parte orders. Appellee, in his motion, alleged that M.F. was currently in his care and that appellant was on probation and suffered from various mental health issues. Appellee further alleged that appellant's mother, with whom appellant resided, was in jail and thus unavailable to care for both appellant and M.F. As memorialized in a Judgment Entry filed on April 26, 2011, M.F. was placed into the temporary custody of appellee.

{¶4} Subsequently, on May 10, 2011, Michael McPherran, Sr., appellant's grandfather, filed a motion seeking legal custody of M.F. and asking for immediate visitation. On May 13, 2011, appellee filed a motion seeking legal custody of M.F.

{¶5} Appellant, on June 9, 2011, filed a motion asking that the temporary orders be modified and that she be permitted to have extended parenting time with

M.F. Pursuant to a Judgment Entry filed on June 17, 2011, the trial court granted appellant parenting time with M.F. and also ordered that Michael McPherran, Sr. have visitation with her.

{¶6} Megan McPherran, appellant's mother and M.F's grandmother, also filed a motion seeking legal custody of M.F.

{¶7} A hearing was held on August 30, 2011 and August 31, 2011. The trial court, pursuant to an Opinion and Judgment Entry filed on November 29, 2011, found that M.F. was not neglected or dependent as alleged in the complaint.

{¶8} Subsequently, a hearing on the issue of custody of M.F. was held on March 13, 2012. At the hearing, the trial court took judicial notice of all prior proceedings and all evidence previously presented in this case. At the previous hearing on the complaint, appellee testified that he was M.F.'s great uncle and that Megan McPharren was his sister. He testified that he and his wife had minimal contact with appellant, Megan and M.F. until he took M.F. into his home on April 9, 2011. Appellee testified that, on April 9, 2011, he received a telephone call from appellant's older sister, Jessica, stating that Megan McPharren was in jail and that she was taking care of appellant and M.F. and was frustrated. Prior to Megan's jailing, appellant had cared for M.F. with assistance from her mother. On April 8, 2011, appellant and M.F. and appellant's sister, Taylor, had gone to stay with Mick McPharren, their grandfather, but only stayed there one day before returning to Megan McPharren's house.

{¶9} Appellee testified that he spoke with appellant about taking care of M.F. while appellant's mother was in jail. On April 9, 2011, appellant voluntarily gave M.F.

to appellee. According to appellee, he invited appellant to live with them also, but she indicated that she did not want to leave Taylor, her younger sister, by herself. Appellant chose to remain with Taylor and to visit M.F. at appelle's house. M.F. was still residing with appellee, his wife and his children as of March 13, 2012 and was doing well in their home. Both appellee and his wife worked during the day and fully supported M.F., who was in daycare.

{¶10} At the previous hearing, Jessica McPharren, appellant's older sister who was born in 1992, testified that their mother, Megan McPharren, asked her to move back into the house with appellant, M.F. and Taylor while Megan was in jail for approximately one month. Jessica moved into Megan's house for two or three weeks. Jessica testified that before Megan was jailed, Megan would tell appellant, who wanted to go out with her friends, that she needed to stay home and take care of M.F. Appellant would "stay with an attitude" and, according to Jessica, wanted nothing to do with M.F. if she was angry with M.F.'s father. Transcript of August 30, 2011 trial at 120. Jessica further testified that before the time she moved back in, she noticed that appellant was awkward with M.F. She testified that her mother, Megan, took care of M.F. most of the time.

{¶11} Jessica McPharren was next questioned about the period after she moved into Megan's home while Megan was in jail. She testified that appellant had problems handling M.F. at night and could only handle M.F. at night if she was taking her ADHD medicine. She also testified that the first few days she was there, she took care of M.F. day and night until she told appellant that she had to start taking care of M.F. during the day. During the day, M.F. would sometimes go to Taco Bell or meet up

with her friends. After such time, appellant took care of M.F. during the day and did okay, other than needing help with bathing her.

{¶12} Jessica McPharren also testified at the hearing that, after she had to take her own child to the emergency room, she returned home and Jody Myer, who was then a family friend, offered to take M.F. overnight to help Jessica out. Appellant, according to Jessica, threw a fit and said no but later brought M.F. out of her room and "said, Here, you can take her overnight because obviously I'm not going to deal with her tonight." Transcript of August 30, 2011 hearing at 128. Appellant, M.F. and Taylor then both ended up at their grandfather's house for one night. When Jessica called her grandfather to see how he was doing, he indicated that he had been up with M.F. since 3:00 a.m. The grandfather then dropped M.F., appellant and Taylor back off at Megan's house.

{¶13} Jessica McPharren also testified at the hearing that, during one incident at appellee's house during June of 2011, appellant was upset that she could not get M.F. to smile and got angry. According to Jessica, appellant roughly passed M.F. off to Jody Myer .

{¶14} On cross-examination, Jessica McPharren testified that she helped take care of M.F. with help from Jody Myer while appellant was in school. She admitted that, during the period of time from M.F.'s birth until appellee filed his motion during the second week of April, M.F. was fed, provided with proper clothing and received medical care. She testified that appellant was upset that her daughter was taken from her by appellee. Jessica agreed that, up until the time her mother was incarcerated, she never had any issues with M.F.'s care. On cross-examination, Jessica also

testified that, just a week or so prior, her mother had texted her and asked her to pick up appellant at school because appellant was going to get into a fight with another girl. She testified that appellant had been in altercations more than four or five times at school.

{¶15} When questioned by the court at the August 2011 hearing about what she meant when she said that appellant beats herself up, Jessica testified that appellant actually hit herself in the face and gave herself a black eye. She testified that this usually happened when appellant was angry or upset with M.F.'s father. Jessica further testified that appellant and M.F. were never left alone overnight  or for a long period of time because of concerns that appellant would get frustrated.

{¶16} At the August 2011 hearing, Jody Myer testified that Megan McPharren was the one who usually cared for M.F. and that Megan would have to tell appellant what to do. She testified that appellant was usually more worried about M.F.s father. Myer further testified that she saw appellant interact with M.F. after M.F. was living with appellee and that appellant was ready to leave in five or ten minutes after arriving. During these visits, appellant would text while holding M.F. and, during one visit, tossed M.F. to Myer. According to Myer, during the month or so that appellant stayed with her while M.F. was living with appellee, appellant, in the beginning, asked to go over and see M.F. However, once M.F.'s father was back in the picture, appellant initiated contact less often and became more focused on M.F.'s father. When asked, Myer stated that she did not think that appellant had the parenting skills to raise M.F.

{¶17} At the August 2011 hearing, the Guardian ad Litem testified that appellant was not mature and had the demeanor of a young girl. He testified that, during her interview, she sat on the couch across from him eating ice cream while texting her friends. He testified that he could tell that she was more interested in M.F.'s father than with M.F. and that he was concerned with her ability to control her emotions.

{¶18} At the March 2012 hearing, Mick McPherran, appellant's grandfather, testified that he had legal custody of appellant and that she was doing well in school. He testified that appellant's grades had improved considerably since school started in the fall and that appellant came to visit M.F. when M.F. was with him, which was twice a week. According to Mick McPharren, appellant and M.F. had a good mother-child relationship and appellant acted appropriately as a parent.

{¶19} On cross-examination, Mick McPharren testified that, although he had legal custody of appellant, appellant went back to live with her mother, Megan, and became pregnant while living with Megan. He admitted that, approximately a year earlier, he had signed an affidavit stating that M.F. was without good parental care. At the time, Megan was in jail for a couple of weeks. He indicated that he believed that was true on May 10, 2011 and testified that he still believed that appellant was unable to provide proper care for M.F. only because she was still in school. When asked, he testified that appellant was not able to care for M.F. by herself, but that she had matured over the last year.

{¶20} During his testimony, Mick McPharren, who is Megan's father, testified that he knew that Megan had filed for disability because of her fibromyalgia and migraines. He further testified that he was aware that she had had a stroke in 2000.

{¶21} At the March 2012 hearing, Andrea Hysell, a service coordinator and home visitor with Ashland County Help Me Grow, testified that appellant had been there for every in home visit that Hysell attended and that appellant played on the floor with M.F. when she was there. Appellant had never cancelled any appointments. Hysell testified that she went to Mick McPharren's home to visit with appellant and that the interaction between appellant and M.F. was appropriate. According to Hysell, appellant helped M.F. with her walking and responded to her. She testified that she observed love and affection between the two and that she had no concerns with appellant being a mother because appellant listened to advice. Hysell had been observing appellant with her daughter a couple of times a month since July 1, 2011.

{¶22} At the March 13, 2012 hearing, appellant testified that she was 16 years old and that she knew that she could take care of M.F. According to appellant, she had some complications after M.F.'s birth and post-partum depression and, for such reasons, her mother sometimes had M.F. Appellant testified that she was still involved with Help Me Grow. She further testified that she thought that appellee was going to take M.F. only until they figured out where appellant was going to go with her daughter and did not think that "it was going to be forever." Transcript of March 13, 2012 hearing at 124. Appellant indicated that appellee told her that she could have her daughter back once Megan McPharren, appellant's mother, got out of jail.

{¶23} Appellant further testified that she intended to finish high school and get a good job and that she was involved in track. She planned on getting her driver's license. She testified that she visited with her daughter at appellee's house, but did not feel comfortable there because she had issues with appellee and because M.F. acted differently towards her when appellant visited her at appellee's house. Appellant voiced her concerns that appellee and his wife had M.F. refer to them as mom and dad and encouraged M.F. to refer to their children as brother and sister. Appellant stated that she believed that she could manage to care for M.F. and indicated that if she was told that she could have her daughter if she lived with her grandfather, she would do so and would not run back to her mother's house. She further indicated that she intended to stay with the Help Me Grow program.

{¶24} On cross-examination, appellant testified that her mother would provide financial support for M.F. if M.F. lived with appellant. Appellant's mother was not employed. Appellant admitted that when she had M.F., there was usually an adult present.

{¶25} As memorialized in an Opinion and Judgment Entry filed on September 5, 2012, the trial court found that appellant was not suitable to be designated M.F.'s legal custodian and that it was in M.F.'s best interest to remain with appellee. The trial court granted appellee legal custody of the child.

{¶26} Appellant now raises the following assignment of error on appeal:

{¶27} "I. THE TRAIL (SIC) COURT ABUSED ITS DISCRETION WHEN IT GRANTED CUSTODY OF A CHILD TO A NON-PARENT WITHOUT SUFFICIENT CAUSE."

I.

{¶28} Appellant, in her sole assignment of error, argues that the trial court abused its discretion when it awarded legal custody of M.F. to appellee, a non-parent. Appellant specifically contends that the trial court erred in finding that she was unsuitable as a parent. We disagree.

{¶29} A trial court enjoys broad discretion in custody proceedings because "custody issues are some of the most difficult and agonizing decisions a trial judge must make." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 1997–Ohio–260, 674 N.E.2d 1159. A trial court's custody determination will not be disturbed unless the court abused that discretion. *Miller v. Miller,* 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). An "abuse of discretion" connotes that the court's attitude is "unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). When applying an abuse of discretion standard, we are not free to merely substitute our judgment for that of the trial court. *In re Jane Doe 1*, 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181 (1991).

{¶30} R.C. 2151.23 gives juvenile courts exclusive jurisdiction to "determine the custody of any child not a ward of another court of this state." The Ohio Supreme Court addressed the issue of when a trial court may award custody of a child such as M.F. to a nonparent in *In re Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977). In *Perales,* the Supreme Court held as follows: "In [a] child custody proceeding between a parent and a nonparent, the hearing officer may not award custody to the nonparent without first making a finding of parental unsuitability-that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the

parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child." *Id.* at syllabus.

{¶31} The paramount right of a parent to custody can be forfeited by demonstrating unsuitability by a preponderance of the evidence. *In Re: Porter*, 113 Ohio App.3d 580, 588, 681 N.E.2d 954 (3rd Dist. 1996). Once the paramount right to custody is forfeited, the court will look to the best interest of the child when determining custody. *Id.* "Preponderance of the evidence" means "evidence that's more probable, more persuasive or of greater probative value." *State v. Finkes*, 10th Dist. No. 01AP–310, 2002-Ohio-1439.

{¶32} In the case sub judice, the trial court specifically found that appellant was "not presently capable of supporting or caring for the child", that an award of custody to appellant would be detrimental to M.F. and that appellant was not suitable to be designated M.F.'s legal custodian.

{¶33} As is discussed above in detail in the statement of facts, Mick McPharren, appellant's grandfather, opined that appellant could not care for M.F. alone. In addition, Jessica McPharren and Jody Myer testified that appellant was not capable of caring for M.F. without assistance from others. There was testimony that appellant sometimes became frustrated and would "beat up" herself, that she had been involved in physical fights in the past, and that, at times, she showed insufficient interest in parenting. Appellant's own mother, Megan McPharren, did not want appellant left alone with M.F. Moreover, the Guardian ad Litem, at the August 2011 hearing, testified that appellant was immature for her age and spent the time eating

ice cream and texting. He was of the opinion that appellant could not adequately parent her daughter without help from others. In his August 2011 report, he stated that he was concerned about appellant's ability to control her emotions after reading text messages that she sent to appellee as well as her Facebook postings.

{¶34} Based on the foregoing, we cannot find that the trial court abused its discretion in finding that appellant was unsuitable to be designated M.F.'s legal custodian and in granting legal custody of M.F. to appellee rather than appellant.

{¶35} Appellant's sole assignment of error is, therefore, overruled.

{¶36} Accordingly, the judgment of the Ashland County Court of Common Pleas, Juvenile Division, is affirmed.

By: Baldwin, J.

Hoffman, P.J. and

Wise, J. concur.

_____
HON. CRAIG R. BALDWIN

_____
HON. WILLIAM B. HOFFMAN

_____
HON. JOHN W. WISE

CRB/dr

IN THE COURT OF APPEALS FOR ASHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| | : | |
| IN THE MATTER OF: M.F., | : | |
| AN ALLEGED | : | |
| DEPENDENT/NEGLECTED CHILD | : | JUDGMENT ENTRY |
| | : | |
| | : | |
| | : | |
| | : | Case No.   12-COA-036 |
| | : | |
| | : | |
| | : | |
| | : | |

For the reasons stated in our accompanying Opinion on file, the judgment of the Ashland County Court of Common Pleas, Juvenile Division, is  affirmed.   Costs assessed to appellant.

_____
HON. CRAIG R. BALDWIN

_____
HON. WILLIAM B. HOFFMAN

_____
HON. JOHN W. WISE