[Cite as *In re A.C.J.*, 2023-Ohio-4218.]

**COURT OF APPEALS OOHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

|  |  |  |
|---|---|---|
| IN RE A.C.J. | : | |
| | : | No. 112745 |
| A Minor Child | : | |
| | : | |
| [Appeal by D.T., a Nonparent] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 22, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. FA21109926

***Appearances:***

Cavitch, Familo & Durkin Co. LPA and Bradley Hull IV,
*for appellant.*

MARY EILEEN KILBANE, P.J.:

{¶ 1} Appellant D.T., a nonparent, appeals from the juvenile court's order that denied his motion for custody or companionship rights of A.C.J., a minor child (d.o.b. 4/08/2010). Based upon the trial court's order, A.C.J. remains in the custody of his Mother, A.J. ("Mother"). The child's biological father has not been identified, is not actively engaged in A.C.J.'s life, and is not a party to this appeal. For the following reasons, we affirm the juvenile court's judgment.

**Factual and Procedural History**

{¶ 2} This matter stems from the relationship between D.T., Mother, and A.C.J. On June 20, 2010, D.T. met Mother as she walked down a street; A.C.J. was two months old at the time. D.T. and Mother engaged in an intimate relationship for a short period of time. After the relationship ended, D.T. maintained interactions with Mother and A.C.J. D.T. contends that he last saw A.C.J. in August 2021.

{¶ 3} On November 4, 2021, D.T. filed a complaint in Cuyahoga J.C. No. FA21109926 seeking third-party custody or companionship time with A.C.J. D.T. alleged that Mother was unfit to have custody and control of A.C.J. as demonstrated by her inattention and neglect of the child; her failure to provide basic needs; her residing in an unsafe, violent neighborhood; and the fact that A.C.J. ran away from Mother's home. D.T. alleged that he had acted as a father figure for the duration of A.C.J.'s life, and he is competent to have custody of A.C.J. D.T. sought emergency custody or, alternatively, emergency companionship rights until a hearing was held following which the court should grant D.T. sole custody of the child. On the same date, D.T. filed a motion for emergency custody and companionship time.

{¶ 4} On November 8, 2021, the juvenile court appointed Attorney Pinkie Clark as guardian ad litem ("GAL") for A.C.J.

{¶ 5} On November 12, 2021, Mother filed a pro se answer to the complaint. Mother alleged she is the sole parent of A.C.J.; the child's biological father is not involved in their lives. Mother alleged that she and D.T. were previously engaged in an intimate relationship for two months, but have not dated for seven years.

{¶ 6} The parties attempted a mediation but were unable to resolve the matter. On December 22, 2021, and January 3, 2022, the juvenile court held video hearings to address D.T.'s motion for emergency custody and companionship but no persons were present for the hearings. On January 4, 2022, the juvenile court dismissed D.T.'s motion for emergency custody and companionship, without prejudice.

{¶ 7} On January 31, 2022, D.T. filed a second motion for emergency custody and companionship. On March 22, 2022, the juvenile court held a hearing on the motion; present at the hearing were Mother, D.T., and D.T.'s counsel. The court held the motion in abeyance to allow Mother time to retain counsel.

{¶ 8} The trial court's July 13, 2022 journal entry indicates that the GAL and Cuyahoga County Division of Children and Family Services ("the agency" or "CCDCFS") made home visits and spoke with A.C.J. and determined there were no concerns about the care and custody of the child. On December 12, 2022, the GAL submitted to the juvenile court her report and recommendation to maintain A.C.J.'s custody with Mother.

{¶ 9} On December 20, 2022, the trial court conducted a hearing on D.T.'s complaint for custody or companionship time. D.T., his counsel, Mother, and the GAL participated at the hearing.

{¶ 10} D.T. testified that he and Mother were involved in a relationship for a couple of weeks in 2010. D.T. continued seeing A.C.J. even after D.T. and Mother ended their relationship. D.T. testified that he was not the biological father of A.C.J.,

but he has held a strong bond with the child since A.C.J. was two months old. D.T. testified that A.C.J. refers to him as his dad. D.T. testified that from 2010 to 2013, Mother would bring A.C.J. to visit and in exchange D.T. compensated Mother: "I was a single man, she's a woman coming over, she needs help. I gave her cash. We may go eat. We may have casual sex." Tr. 106. D.T. stated that Mother would withhold his access to A.C.J. if she felt D.T. had not paid her sufficient funds.

{¶ 11} D.T. testified that he considered himself a father figure for A.C.J. starting in 2012:

> [S]he kept needing money and I was sympathetic toward the child, and I explained to her several times that we're not getting along, but I will be a father to the child if we can agree upon that, and she would agree upon that when things suited her well.
>
> When I didn't give her enough money, she would renege.

Tr. 99. D.T. testified that he and Mother entered an oral agreement in 2015 agreeing D.T. could act as A.C.J.'s father.

{¶ 12} D.T. testified that in 2015 A.C.J. had difficulty in school and, therefore, A.C.J. lived with D.T. and his mother from 2015 through 2016 and during the summers of 2016, 2017, and 2018. D.T. testified that from September 2016 through September 2018, A.C.J. would alternate between the homes of D.T. and Mother, depending upon the adult's work schedules. D.T. testified that from September 2018 through August 2021, Mother would allow D.T. access to A.C.J. temporarily but would then prevent him from seeing A.C.J. because she did not

receive enough money from D.T.: "I have to actually pay her to see him. It's been like that for the last 12 years." Tr. 112.

{¶ 13} D.T. testified that Mother was an unfit parent because she yelled at and hit A.C.J. D.T. testified that when A.C.J. was younger, Mother whipped him with the cord from an iron, leaving marks on his shoulders. D.T. testified that he observed Mother hit A.C.J. on his back and arms with a broom when he did not properly clean his room. D.T. testified that Mother roughly handled A.C.J. D.T. testified that Mother threw away A.C.J.'s television set and broke his PlayStation console and cell phone as forms of punishment. D.T. testified that Mother "whooped [A.C.J.] real bad" for contacting D.T. Tr. 124. D.T. testified that he observed verbal abuse by Mother, who used profanities directed at the child and threatened to throw him out of her house. D.T. testified that A.C.J. ran away from Mother's home to D.T.'s home on two occasions, and he believed A.C.J. also ran away to someone else's home. D.T. testified that he reported Mother to the agency in 2021, but he did not know the outcome of the investigation. D.T. testified that Mother lived in a "very bad" neighborhood. Tr. 119.

{¶ 14} D.T. testified that he drafted exhibit No. 1 — a letter dated September 1, 2016, that referenced A.C.J. as D.T.'s stepson and stated Mother and D.T. were jointly raising A.C.J. D.T. and Mother signed and submitted the letter in an attempt to obtain food stamps for D.T. On his own initiative, D.T. also attempted to add A.C.J. to his medical insurance plan.

{¶ 15} Mother testified that she and D.T. engaged in a relationship for two to four weeks in July 2010. Mother testified that D.T. is not the biological father of A.C.J., and D.T. has no obligation to pay child support for the child. Mother denied that she asked D.T. for money over the years, but stated she accepted money when offered.

{¶ 16} Mother testified that for a few months during the summer of 2016, she and D.T. shared custody of A.C.J.; Mother denied that A.C.J. lived with D.T. for an entire year. Mother testified that D.T. last had physical contact with A.C.J. in 2018, when A.C.J. watched pornography while in D.T.'s care; following that incident, Mother no longer allowed D.T. contact with the child.

{¶ 17} Mother testified that she did not verbally abuse A.C.J. or yell obscenities at the child. Mother testified that she enrolled A.C.J. in school and she takes him to the doctor when needed. Mother testified that A.C.J.'s grades were declining in September 2021, but he improved his grades within a few months. Mother testified that she recently placed A.C.J. on medication that improved his behavior. Mother testified that her punishment of A.C.J. includes withholding his phone and video games; she denied withholding food or engaging in physical punishment. Mother testified that she has been investigated by the agency, but A.C.J. has never been removed from her custody.

{¶ 18} Mother testified that A.C.J. did not call D.T. his father. Mother admitted that A.C.J. twice ran away to his neighbor's home and in 2021 he ran away from respite care to D.T.'s home.

{¶ 19} Mother testified that she has owned her home for 14 years. Mother denied that she lived in an unsafe neighborhood and described her home as "awesome" and "really safe." Tr. 35. Mother testified that the police were called to her home four times in the past three years for wellness checks and in response to Mother's calls when D.T. appeared at her home uninvited. Mother denied that the police were called to her home because she discharged a firearm in her front yard. Mother testified that D.T. threatened to take her to court if she did not allow him to see A.C.J.

{¶ 20} Mother denied that she executed a document whereby she agreed to share her parental rights with D.T. Mother denied that she and D.T. ever lived together.

{¶ 21} Clarence Mitchell ("Mitchell"), D.T.'s neighbor, testified on D.T.'s behalf. Mitchell testified that D.T. and A.C.J. engaged in father-son activities such as learning how to ride a bicycle, playing sports, and building items. Mitchell testified that he knows A.C.J. as D.T.'s son and A.C.J. referred to D.T. as "dad." Mitchell testified that he did not know of a time when A.C.J. lived permanently with D.T., but he recalls the child being present on weekends. Mitchell testified that D.T. served as a positive role model to A.C.J., and D.T. provided financial support to Mother. Mitchell also testified that A.C.J. appeared well-cared for; nothing in his appearance caused him concern for the child.

{¶ 22} D.J., mother of D.T., testified that she referred to A.C.J. as her grandchild and the child has lived in her home, with D.T., at various times. D.J.

testified that as a young child, A.C.J. called her "grandma," and she felt D.T. and A.C.J. had a father-son relationship. D.J. testified that A.C.J. spent holidays with her and her family.

{¶ 23} The GAL testified that she met with A.C.J. in his home, outside of Mother's presence, and at an unannounced visit at the child's school. The GAL testified that A.C.J. likes the people he interacts with at D.T.'s home, but he wants to live with his Mother. The GAL testified that she was concerned about Mother accepting money in exchange for allowing A.C.J. to spend time with D.T., but she heard no statements about inappropriate behavior. The GAL testified that there was no reason A.C.J. could not live in Mother's neighborhood. The GAL testified that A.C.J. is "doing well," and the agency has not opened a case against Mother. The GAL testified that she was unaware of any evidence that Mother is unfit.

{¶ 24} Following trial, the magistrate issued a journal entry on December 30, 2022, that found Mother was not unfit or unsuitable to provide care for A.C.J. The court further found that D.T. had no legal rights to the child and was not eligible for an order of companionship under R.C. 3109.12.

{¶ 25} On January 12, 2023, D.T. filed objections to the magistrate's decision. On April 7, 2023, D.T. filed the transcript and supplemental objections to the magistrate's decision.

{¶ 26} On April 17, 2023, the trial court reviewed D.T.'s objections to the magistrate's decision, the transcript, and the GAL's recommendations and made the following findings:

The Court finds the mother of the child and D.T. had a [casual] relationship for a couple of weeks in the summer of 2010, when the child was two or three months old. They met while the mother was walking down the street.

The Court further finds that D.T. is not the child's father. He did not meet the mother until after the child was born. The mother and D.T. never lived together and never as a family with the child.

The court further finds that D.T. wanted to be the father figure for the child and would pay the mother either in money or kind to be the father of the child. The court further finds that if D.T. did not pay the mother or give her something, like the use of a car, she would not let him see the child. The mother would often stop visits with the child because he did not pay her enough.

The court further finds that D.T. offered to help her with the child, which she accepted. As time went on mother would ask for help and D.T. would help her when asked.

The court further finds that the mother would occasionally, especially at the beginning of the relationship, leave the child in the care of D.T. or his mother for days at a time.

The court further finds that in 2012 the mother and D.T. agreed that he would be the father to the child, but the mother reneged on that agreement a short time later when D.T. did not pay her.

The court further finds that the child has had behavior problems, especially at school. He has run away on a number of occasions. He ran to D.T.'s home and to a friend's home but was returned to the mother each time.

The mother owns her own home and has owned for a number of years. Though the home [may be] in a dangerous neighborhood there are a number of single-family homes that are well kept. There was no evidence presented that the neighborhood was too dangerous for the child to reside.

The court further finds that D.T. has made referrals to Cuyahoga County Division of Children and Family Services about the care of the child and requests for welfare checks by the police department to the mother's home. The referrals to Cuyahoga County Division of Children

have not resulted in a case being opened and the welfare checks did not result in a finding that the child was in any harm.

The trial court found that D.T. did not show that Mother is an unfit parent and, therefore, dismissed D.T.'s application to determine custody or companionship.

{¶ 27} On May 22, 2023, D.T. filed a timely appeal from the trial court's April 17, 2023 judgment entry presenting a sole assignment of error for our review:

> The trial court committed reversible error in determining that D.T. did not meet his burden of proof in showing that he should be granted custody and/or companionship of the minor child.

## Legal Analysis

{¶ 28} D.T. argues that the trial court erred and abused its discretion when it denied his motion for custody or companionship of A.C.J.

{¶ 29} We review a trial court's custody determination under an abuse of discretion standard. *In re P.M.*, 8th Dist. Cuyahoga No. 109968, 2021-Ohio-3358, ¶ 32, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983); *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463.

## Unsuitability Determination

{¶ 30} "[T]he overriding principle in custody cases between a parent and nonparent is that natural parents have a fundamental liberty interest in the care, custody, and management of their children." *Hockstok v. Hockstok*, 98 Ohio St.3d

238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 16, citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

{¶ 31} In a child custody proceeding between a parent and a nonparent, a trial court must first make a parental unsuitability determination before legal custody may be awarded to the nonparent. A finding of unsuitability requires the trial court to

> determin[e] that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child.

*In re Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977), syllabus. ""'Preponderance of the evidence' means 'evidence that's more probable, more persuasive, or of greater probative value.'"" *In re C.V.M.*, 8th Dist. Cuyahoga No. 99426, 2013-Ohio-3361, ¶ 6, quoting *In re M.F.*, 5th Dist. Ashland No. 12-COA-036, 2013-Ohio-1755, quoting *State v. Finkes*, 10th Dist. Franklin No. 01AP-310, 2002-Ohio-1439.

{¶ 32} Where a trial court finds that one of the identified circumstances exists, the parent may be adjudged unsuitable. *Hockstok* at ¶ 17. We emphasize that "'[t]he appropriate analysis is whether the natural parent] is unsuitable as custodian, not whether someone else is *more* suitable.'" *In re D.C.J.*, 2012-Ohio-4154, 976 N.E.2d 931, ¶ 58 (8th Dist.), quoting *In re S.M.*, 160 Ohio App.3d 794, 2005-Ohio-2187, 828 N.E.2d 1044, ¶ 31 (8th Dist.), (McMonagle, J., concurring). The nonparent bears the burden to demonstrate the parent's unsuitability. *In re*

*D.C.J.* at ¶ 58, citing *Scavio v. Ordway*, 3d Dist. Shelby No. 17-09-07, 2010-Ohio-984, ¶ 26.

{¶ 33} D.T. argues that he and Mother entered a mutual agreement by which D.T. would be a father figure to A.C.J. and he would help the child. D.T. further argues that Mother intended for D.T. to be A.C.J.'s father or to surrender parental rights to D.T. D.T. also argues that Mother's neighborhood is too dangerous for A.C.J. to reside there.

{¶ 34} In Ohio, a parent may relinquish parental rights to a third-party nonparent as evidenced by either a written instrument or through the parent's conduct. *In re Lapiana*, 8th Dist. Cuyahoga Nos. 93691 and 93692, 2010-Ohio-3606, ¶ 30-33. "'[A] written agreement, while instructive, is not necessary; a parent may relinquish custody by conduct, and a court must look at the evidence as a whole.'" *In re R.M.R.*, 2016-Ohio-303, 59 N.E.3d 540, ¶ 18 (8th Dist.), quoting *Masitto v. Masitto*, 22 Ohio St.3d 63, 66, 488 N.E.2d 857 (1986). The relinquishment of a parent's rights to custody is a question of fact determined by the testimony and evidence presented in each case. *In re Lapiana* at ¶ 30, quoting *Masitto* at 66.

{¶ 35} The evidence demonstrates that Mother and D.T. did not live together nor did they enter a written agreement whereby Mother relinquished or extended parental custody to D.T. Mother left A.C.J. in D.T.'s care and custody sporadically from 2010 through 2018. D.T. occasionally picked up A.C.J. from school and attended a few school functions. D.T. testified that he and Mother entered a verbal

agreement in 2015 to allow D.T. to act as A.C.J.'s father, but he also stated that Mother reneged on that agreement. The testimony on whether A.C.J. referred to D.T. as his father varied — D.T. and his neighbor Mitchell testified that he did but Mother denied such an allegation.

{¶ 36} All parties concede that D.T. provided Mother with money and other goods, and he purchased items for A.C.J. But these acts alone do not equate to Mother's relinquishment of parental rights. Similarly, singular incidents — such as the September 1, 2016 letter seeking food stamps for D.T. on A.C.J.'s behalf or D.T.'s attempt to add A.C.J. to his work medical insurance policy — do not demonstrate that Mother relinquished parental rights to D.T. *Compare In re Lapiana.* (A parent's conduct demonstrated relinquishment of sole custody rights to a third-party nonparent where the couple, who was in a committed ten-year relationship, bought a home together; planned to have two children; the children, friends, teachers, health insurance carriers, doctors, and others in the community referred to the nonparent as the children's mother; and the parent and nonparent entered a written agreement to jointly raise the first born child.).

{¶ 37} The record does not show that Mother abandoned A.C.J., that Mother was totally incapable of supporting or caring for A.C.J., or that an award of custody to Mother would have been detrimental to A.C.J. Mother is gainfully employed and owns the home where she resides with A.C.J. Mother enrolled A.C.J. in school and recently obtained prescriptions for the child to assist with ADHD. While D.T. testified that Mother was abusive and withheld food from the child, the agency

investigated Mother and declined to create a case plan or bring charges against her. And while D.T. testified that Mother's neighborhood was unsafe, the GAL testified there were well-cared for single-family homes in the area, and she did not agree that A.C.J. could not reside there with Mother. The GAL also recommended A.C.J. remain in Mother's custody.

{¶ 38} For the foregoing reasons, D.T. did not meet his burden to demonstrate Mother was an unsuitable parent and, therefore, the trial court did not err when it denied D.T. an award of custody.

**Companionship Rights**

{¶ 39} D.T. argued, alternatively, that he was entitled to companionship rights with the child. R.C. 3109.12 governs companionship rights and reads in relevant part:

> (A) If a child is born to an unmarried woman, the parents of the woman and any relative of the woman may file a complaint requesting the court of common pleas of the county in which the child resides to grant them reasonable companionship or visitation rights with the child. If a child is born to an unmarried woman and if the father of the child has acknowledged the child and that acknowledgment has become final pursuant to section 2151.232, 3111.25, or 3111.821 of the Revised Code or has been determined in an action under Chapter 3111. of the Revised Code to be the father of the child, the father may file a complaint requesting that the court of appropriate jurisdiction of the county in which the child resides grant him reasonable parenting time rights with the child and the parents of the father and any relative of the father may file a complaint requesting that the court grant them reasonable companionship or visitation rights with the child.

{¶ 40} Pursuant to the statute, only the parents or relative of an unmarried woman or the acknowledged father of a child born to an unmarried woman is

entitled to companionship rights. D.T. is not the acknowledged father of A.C.J. and, thus, has no rights under the statute to seek companionship time with the child.

{¶ 41} We note that much of the trial testimony related to D.T.'s allegation that he would be a more suitable parent for A.C.J. D.T. testified that "I'll be a better parent. Even absolutely a better location. I want him to live with me. He'll be safer and be more educated. He'll be in a safer environment. People will love him. He spends a lot of time by [himself] in the house." Tr. 134. We acknowledge that D.T. may have been a positive influence in the child's life, and he may have contributed financially and emotionally to A.C.J.'s well-being. However, the trial court's focus was whether the parent — Mother — was a suitable parent, rather than D.T.'s suitability. *In re O.P.*, 8th Dist. Cuyahoga No. 109355, 2020-Ohio-4835, ¶ 16, citing *In re C.V.M.*, 8th Dist. Cuyahoga No. 99426, 2013-Ohio-3361 at ¶ 15. The trial court could not compare or consider which home was better suited for A.C.J. without evidence that Mother was unsuitable.

{¶ 42} Absent a showing by a preponderance of the evidence that Mother was unsuitable as a parent or that D.T. qualified for companionship rights under R.C. 3109.12, the trial court did not abuse its discretion when it denied D.T.'s motion for custody or companionship.

{¶ 43} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MARY EILEEN KILBANE, PRESIDING JUDGE

LISA B. FORBES, J., and
SEAN C. GALLAGHER, J., CONCUR